1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11    KENNETH OLIVER,                    )    Case No.: 1:14-cv-00088-LJO-SAB (PC)
                                         )
12                    Plaintiff,         )
                                         )    **FINDINGS AND RECOMMENDATIONS**
13         v.                            )    **RECOMMENDING DISMISSAL OF CERTAIN**
                                         )    **CLAIMS FOR FAILURE TO STATE A**
14    DARRYL ADAMS, et al.,              )    **COGNIZABLE CLAIM UPON WHICH RELIEF**
                                         )    **MAY BE GRANTED**
15                    Defendants.        )
                                         )    [ECF No. 24]
16    _____)

17         Plaintiff Kenneth Oliver is appearing pro se and in forma pauperis in this civil rights action

18    pursuant to 42 U.S.C. § 1983.

19         Now pending before the Court is Plaintiff's second amended complaint, filed March 12, 2015.[1]

20    (ECF No. 24.)

21                                   **I.**

22                          **SCREENING REQUIREMENT**

23         The Court is required to screen complaints brought by prisoners seeking relief against a

24    governmental entity or officer or employee of a governmental entity.  28 U.S.C. § 1915A(a).  The

25    Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally

26

27    _____

28    [1] A duplicate copy of the second amended complaint, minus the standard complaint form and exhibits was lodged with the
      Court on March 19, 2015.  (ECF No. 25.)

                                         1

"frivolous or malicious," that "fail[] to state a claim on which relief may be granted," or that "seek[] monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief. . . ." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Moreover, Plaintiff must demonstrate that each defendant personally participated in the deprivation of Plaintiff's rights. Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).

Prisoners proceeding pro se in civil rights actions are entitled to have their pleadings liberally construed and to have any doubt resolved in their favor. Wilhelm v. Rotman, 680 F.3d 1113, 1121 (9th Cir. 2012) (citations omitted). To survive screening, Plaintiff's claims must be facially plausible, which requires sufficient factual detail to allow the Court to reasonably infer that each named defendant is liable for the misconduct alleged. Iqbal, 556 U.S. at 678-79; Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009). The "sheer possibility that a defendant has acted unlawfully" is not sufficient, and "facts that are 'merely consistent with' a defendant's liability" falls short of satisfying the plausibility standard. Iqbal, 556 U.S. at 678; Moss, 572 F.3d at 969.

## II.

## COMPLAINT ALLEGATIONS

Plaintiff is a faithful adherent to the African based spiritual practice commonly referred to as "Shetaut Neter." Plaintiff has practiced Shetaut Neter since 2000. Shetaut Neter is an African derived spiritual system with roots that extend back to dynastic Egypt and has numerous followers around the world. The central aims and tenets enjoined in the Shetaut Neter practice involve men and woman seeking oneness with God in an effort to attain God-like consciousness through a life of virtue and cultivation of the spirit. This practice relies heavily on the study of scientific knowledge, meditation, and daily prayer practice, body discipline and maintaining an ascetic diet.

As a practitioner of Shetaut Neter, Plaintiff is required to study the various texts and scriptures related to its practice, worship through prayer and meditation using a prayer rug at least three times

daily, maintain a specific and stringent vegetarian diet (commonly referred to as the "Kemetic Diet"), participate in group study, worship and service, and honor through recognition and practice specific religious holiday observances.

The Kemetic Diet is a central tenet and component to the practice of Shetut Neter and prohibits the consumption of any meat or animal derived product, including dairy and egg products; wheat or products containing refined sugar or any genetically modified foods.  In short, Plaintiff is required to maintain a diet that consists of 80% raw foods such as nuts, seeds, fruits and vegetables, and approximately 20% cooked foods such as legumes, tofu, soy, and other vegetarian sources of proteins, calories and vitamins.

On February 26, 2009, Plaintiff was transferred from the California Men's Colony in San Luis Obispo to Corcoran State Prison, Security Housing Unit (SHU).  Shortly after Plaintiff's arrival at Corcoran, he submitted a "request for interview" form to the Corcoran Chapel for religious services requesting an accommodation for his religious based dietary needs and for information regarding authorization on how he could obtain his personal prayer rug from his property and other materials related to his spiritual practice.  Plaintiff received no response.

In May of 2009, approximately 45 days after Plaintiff initially submitted the request for interview, Plaintiff submitted a second request to the Chapel in an effort to obtain approval for religious accommodations mentioned above.  Plaintiff received no response.

After Defendants failed to respond to Plaintiff's second written request, Plaintiff filed an administrative appeal regarding Defendants refusal to provide him with reasonable opportunity to exercise his religious practice when there was no meaningful or legitimate penological interest in doing so.

On July 29, 2009, Defendant A. El-Amin, interviewed Plaintiff in regard to his grievance and request for religious accommodation.  Defendant El-Amin informed Plaintiff that he would accommodate Plaintiff's request to be provided religious study materials and scriptural texts related to the practice of Shetaut Neter and that the Chapel would order the materials during its next purchase order.  In regard to Plaintiff's other religious request, El-Amin informed Plaintiff that he would look into accommodating Plaintiff's requests with the "head chaplains."

On August 4, 2009, Defendants El-Amin and Field forwarded Plaintiff a memorandum that stated his administrative appeal was being "partially granted."  Specifically, the memorandum stated that Plaintiff's request for religious books and materials would be accommodated and expedited as soon as possible.  Plaintiff's request for access to a Shetaut Neter priest or access via service on DVD or the institutional television channels was denied.  Defendants informed Plaintiff that religious television programming was the responsibility of the "educational heads," and his diet requirements had to be coordinated through the institution food services.  Defendants denied all other accommodation requests made by Plaintiff.

Plaintiff appealed Defendant El-Amin and Fields denial of his request for religious accommodations to the Warden of Corcoran, Defendant Derral Adams.  Defendant R. Davis addressed Plaintiff's appeal on behalf of Derral Adams.  Davis informed Plaintiff that he would not be allowed any type of group service because he is housed in the SHU and Plaintiff could worship individually within his cell.  Davis denied Plaintiff's religious diet request, as well as all other requests for reasonable accommodations.

Defendants N. Grannis and K. Kostecky, on behalf of Defendant Cate, denied all of Plaintiff's requests for reasonable religious accommodations, stating in essence that Plaintiff could put his blanket on the floor and worship/pray in his cell.

Between October 2009 through June 2010, Plaintiff submitted multiple requests to Defendants El-Amin, M. Smith, and Van Klaverer, seeking confirmation of the religious scriptural texts, which were never received.

Sometime between 2010 through 2011, Corcoran officials began broadcasting at least five separate Christian channels through its institutional closed-circuit television system.  These channels broadcast Christian programming 24 hours a day, seven days a week, in both English and Spanish. These channels dedicated exclusively to Christian content were the sole religious programming broadcast through Corcoran's institutional television system.

Upon information and belief the institutionally broadcast religious programming was facilitated by Defendants Van Klaverer, Smith, Adams, Davis, El-Amin, Field, Carron, and/or any of

4

several Doe Defendants.  These Defendants are directly responsible for the prison's religious and institutional television programming decisions.

CDCR has promulgated rules and regulations that set forth its policies regarding religious programming for prisoners under its charge.  Defendant Cate was responsible for the administration and implementation of CDCR's policies, practices, and procedures.  Consequently, he had both the authority and responsibility to ensure that CDCR's religious programming policies were all inclusive and flexible enough to comply with and not choke the constitutional rights of all prisoners.

Defendants Does   Four and Five were responsible for all programming and policy formulation within CDCR's adult institutions and to ensure consistently and uniformity in their development and application.  Moreover, these Defendants had managerial responsibility for the Office of Community Resources, who is responsible for providing policy and training to institutional staff regarding religious programming.

Defendant Doe Six was responsible for all aspects of policy and programming formulation for CDCR's Division of Support Services, which includes the Department's religious programming.  This Defendant has complete line authority over the approval or disapproval of religious programming policy and reports directly to the Secretary of CDCR.

Defendant Doe Seven was charged with providing policy, supervision and training to the institution's staff who would be directly responsible for providing religious accommodations to prisoners.

Defendants Cate and Does Four through Six have created, adopted, or enforced a religious service policy that provides for a Jewish Chaplain or Rabbi to have absolute autonomy and decision making authority over determining: (a) whether or not a prisoner is or isn't "Jewish" in accord with a subjective and bias criteria determined by the Jewish chaplain; and (b) who can and cannot participate in the Jewish Kosher Diet program.  This policy does not take into account the actual religious faith of the prisoner applying, but rather is being determined based on proof of a so-called Jewish ethnicity. For example, a prisoner applicant who can show that his mother or father is "Jewish" would be approved for receipt of a religious based Kosher diet.  On the other hand, a prisoner who had studied

and adopted the Jewish faith, but who wasn't considered by the Jewish Chaplain to be a so-called "real" Jew by birth would be disapproved to participate in the program.

These Defendants created, adopted, or enforced this policy while not making the same or similar requirements on other religious diet programs or its prisoner participants.  No other faith-based Chaplain has been given the autonomy and final decision making authority to determine the faith and beliefs of a prisoner or the necessity of a particular religious diet relevant to his religious practice.

In addition, these Defendants created, adopted, or enforced a policy that advanced only two real religious diets, Jewish and Islamic, while failing to promulgate a policy that allowed dietary opportunities to prisoners who subscribe to other denominations or faiths.

This policy also advanced preferential treatment to those "approved" Jewish diet prisoners and discriminated against those of other faiths, by allowing any prisoner, Muslim or non-Muslim to receive an Islamic Halal diet, while at the same time not allowing "non-Jewish" prisoners to receive a Jewish Kosher diet.

Defendants Cate and Does Four through Six were responsible for the supervision, oversight, training and compliance of CDCR's Community Resource Unit (CRU).  The CRU administers, interprets, and formulates religious policy and procedures; reviews chaplain selections prior to appointment; and advises on the conduct of religious programs and in-service training for chaplains.

Defendants Cate and Does Four through Six have created, adopted, or enforced a policy that requires each institution to have a Religious Review Committee.  This committee must be comprised of designated chaplains, and a correctional captain or their designee.

This policy mandates that a Religious Review Committee shall not deny accommodations for religious services unless the denial is for reasons which would impact facility safety and security and orderly day to day operation of the institution.

This provision of the policy is actually illusory and empty because Defendants Cate and Does Four through Six have promulgated and enforced a policy that confines any so-called Religious Review Committee's authority or discretion to approve a prisoner's request for religious service beyond that which Defendants have already approved and advanced.

Defendant Cate and Does Four and Six have approved and advanced the Jewish Kosher diet and the Muslim Halal diet while failing to provide regulations that allow for the dietary provisions for prisoners of alternative faiths.

This same regulatory restriction infects the type of spiritual advisors or chaplains CDCR dictates can be paid to enter the prisoner to administer service.  Defendants have formulated and enforced a policy that prefers Western World religions while marginalizing and relegating alternative faiths to second class status.  This preference manifests itself in the policy itself, which allows only paid spiritual advisor or chaplain positions for Islam, Judaism, Christianity, and Native American.

Apart from the statewide mandates regarding particular religious services for particular denominations, CDCR has charged each institution Warden with the responsibility for the religious programming in their respective prisons.  Chief Deputy Wardens or Associate Wardens are charged with the supervision of the staff chaplains.

Defendant Adams formulated and enforced Corcoran's "Operational Procedure" No. 804 "Religious Program."  This procedure set forth the policy directives for the accommodation of religious services.  Defendants El-Amin, Carron, and Does One through Three, under the supervision of Defendant Smith, were responsible for the implementation of this procedure.

Upon information and believe, neither CDCR or Corcoran has ever authorized an Institutions Food Services Division to approve or deny religious diet accommodation requests.  Nor is Plaintiff aware of any policy instructing prisoners to pursue such channels.

Plaintiff is aware, through observation and knowledge, that Defendants Smith and El-Amin regularly approve requests made by prisoners to receive a so-called vegetarian or Halal religious diet, whether or not the request is based on a religious practice or faith.

Plaintiff is aware through observation and knowledge that Defendant Carron routinely denied prisoner's religious accommodation requests for a Jewish Kosher diet unless a prisoner could "prove" he was born Jewish or that he had been converted by a sanctioned Temple or Rabbi in free society, whether or not the request was based on the actual practice of Judaism.

7

Plaintiff is aware through observation and knowledge that Defendants El-Amin, Carron, and Does One through Three have routinely approved requests by prisoners to possess prayer rugs for religious worship.  These prisoners belonged to one of Corcoran's "approved" faith groups.

Both CDCR and Corcoran have codified policies and allocated funds to fulfill the purchase of religious books, materials, video and audiotapes, and other religious items for the purpose of religious programing and accommodation.  Upon information and belief, Defendants have allocated and used these funds primarily on the five "approved" denominations, and have failed or refused to provide funding for books, materials and other religious items for prisoners who practice alternative faiths.

Upon information and belief Defendants Smith, El-Amin, Adams, Fields, Carron and Does One through Three were responsible for the budgeting, procurement, and allocation of religious books, audio and video tapes and other religious materials for prisoners at Corcoran.

Defendants Adams, Davis, Fields, Smith, El-Amin, Carron, and Does One through Three, have ordered, procured, allocated and approved the purchase of religious materials for the five "approved" faiths mentioned herein.

Plaintiff is aware that sometime between 2010 and 2011, Defendants arranged and approved provisions for the installation of at least five separate Christian based broadcasting channels to be broadcast through Corcoran's institutional television system.  These channels broadcast Christian religious services 24 hours a day, seven days a week, and were the only religious themed programming piped through the institution's television system.

Prior to installation of the Christian broadcasting channels, Defendants denied Plaintiff's request for Shetaut Neter religious services to be broadcast on Corcoran's institutional television system.

CDCR employs the use of "holding cages" throughout the prison system.  These cages are used to hold and detain individual prisoners for both long and short periods of time.  These cages are regularly used in the SHU for classification hearings, recreational and therapy groups, educational testing, mental health interviews, and television watching for prisoner's mental health treatment. These cages are situated inside a secure "dayroom" inside each SHU housing unit.

Plaintiff contends he was forced to pray and worship on a concrete floor without the cleanliness or devotional reverence provided by one's prayer rug.

Defendants have housed Plaintiff in the solitary confinement of the SHU for non-disciplinary reasons for close to seven years.  During this time, Plaintiff has been denied all physical contact, including any visits with his family and loved ones.  He has not been allowed a single phone call. Plaintiff has also been denied any opportunity for education, recreation, or any other form of rehabilitative program.  He has been denied any sort of meaningful conversation with other human beings on a regular or even periodic basis.

## III.

### DISCUSSION

#### A.    Religious Land Use and Institutionalized Persons Act (RLUIPA)

To state a claim under RLUIPA a plaintiff must show that a person acting under color of state law "imposed a substantial burden on his religious exercise."   Florer v. Congregation Pidyon Shevuyim, N.A., 639 F.3d 916, 921 (9th Cir. 2011).   Under RLUIPA a plaintiff bears the initial burden of setting forth a prima facie claim that there is a substantial burden on the exercise his religious beliefs.   Warsoldier v. Woodford, 418 F.3d 989, 994 (9th Cir. 2005.)   RLUIPA is to be broadly construed in favor of protecting the inmate's right to exercise his religious beliefs. Warsoldier, 418 F.3d at 995.

The first step is to identify the religious exercise that is being affected and then determine if the policy at issue is a substantial burden on that religious exercise.   Greene v. Solano County Jail, 513 F.3d 982, 987 (9th Cir. 2008).   RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C § 2000cc-5(7)(A). To violate RLUIPA, Plaintiff must show that the denial of services placed a substantial burden on his right to exercise his religion.   "In the context of a prisoner's constitutional challenge to institutional policies, [the Ninth Circuit] has held that a substantial burden occurs 'where the state ... denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.' "   Hartman, 707 F.3d at 1124-25 (quoting San Jose Christian Coll. v. City of Morgan Hill, 360 F.3d 1024, 1034 (9th Cir.

9

2004)).   An outright ban of a religious exercise has been held to place a substantial burden on an inmate's right to exercise his religious beliefs.  Greene, 513 F.3d at 988.

Based on Plaintiff's allegations in the first amended complaint, Plaintiff states a cognizable claim under RLUIPA against Defendants Cates, Adams, Davis, Field, Smith, El-Amin, Grannis, Kostecky, and Does Four through Six.

**B.      Free Exercise of Religion**

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."  Turner v. Safley, 482 U.S. 78, 84 (1987).  Nevertheless, prisoners' constitutional rights are subject to substantial limitations and restrictions in order to allow prison officials to achieve legitimate correctional goals and maintain institutional security.  O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987); Bell v. Wolfish, 441 U.S. 529, 546-47 (1979).

"Inmates . . . retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion."   O'Lone, 482 U.S. at 348 (internal quotations and citations omitted).  The protections of the Free Exercise Clause are triggered when prison officials substantially burden the practice of an inmate's religion by preventing him from engaging in conduct which he sincerely believes is consistent with his faith.  Shakur v. Schriro, 514 F.3d 878, 884-85 (9th Cir. 2008); Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1997), overruled in part by Shakur, 514 F.3d at 884-85.  However, an inmate's rights and privileges are necessarily limited by the fact of incarceration and may be curtailed to achieve legitimate correctional goals or maintain institutional security. O'Lone, 482 U.S. at 348.  To prevail on his free exercise claim, Plaintiff must allege facts to plausibly show that the government denied him a "reasonable opportunity of pursuing [his] faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." Hartmann v. California Dep't of Corrections and Rehabilitation, 707 F.3d 1114, 1122 (9th Cir. 2013) (quoting O'Lone, 482 U.S. at 348).

Based on Plaintiff's allegations in the first amended complaint, Plaintiff states a cognizable claim under the Free Exercise Clause against Defendants Cate, Adams, Davis, Field, Smith, El-Amin, Grannis, Kostecky, and Does Four through Six, relating to Plaintiff's religious diet, prayer rug, religious materials, worship service, and other programming.

### C.     First Amendment Establishment Clause

The Establishment Clause of the First Amendment "prohibits the enactment of a law or official policy that 'establishes a religion or religious faith, or tends to do so.'"  Newdow v. Lefevre, 598 F.3d 638, 643 (9th Cir. 2010) (quoting Lynch v. Donnelly, 465 U.S. 668, 678, 104 S.Ct. 1355 (1984)).  The clause applies to official condonement of a particular religion or religious belief, and to official disapproval or hostility towards religion.  American Family Ass'n, Inc. v. City and County of San Francisco, 277 F.3d 1114, 1120-21 (9th Cir. 2002) (quotation marks and citations omitted).

Here, liberally construed, Plaintiff's allegations in the second amended complaint as to the preferential treatment of "conventional" religions such as Judaism and Christianity states a cognizable Establishment Clause claim against Defendants Cate, Adams, Davis, Field, Smith, El-Amin, Grannis, Kostecky, Van Klaverer, and Does Four through Six.

### D.     Equal Protection

The Equal Protection Clause requires that all persons who are similarly situated should be treated alike.  Lee v. City of Los Angeles, 250 F.3d 668, 686 (2001);  City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985).  An equal protection claim may be established by showing that the defendant intentionally discriminated against the plaintiff based on the plaintiff's membership in a protected class, Lee, 250 F.3d at 686; Barren v. Harrington, 152 F.3d 1193, 1194 (1998), or that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose,  Thornton v. City of St. Helens, 425 F.3d 1158, 1167 (2005); Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

Based on Plaintiff's allegations in the first amended complaint, Plaintiff states a cognizable claim under the Equal Protection clause against Defendants Cates, Adams, Davis, Field, Smith, Van Klaverer, El-Amin, Grannis, Kostecky, and Does Four through Six.

### E.     Due Process Violation

Plaintiff contends he has a state-created liberty interest by statute, as well as a liberty interest protected by the Due Process Clause of the United States Constitution to have the ability to freely exercise his religious beliefs, and Defendants denial of this interest has created an atypical and significant hardship on Plaintiff.

Plaintiff's claims of denial of religious accommodation do not arise under the Due Process clause, but are subsumed within his First Amendment and RLUIPA claims. Accordingly, Plaintiff fails to state a cognizable due process violation.

### F.    Cruel and Unusual Punishment

Plaintiff contends that the denial of his religious rights is cruel and unusual punishment in violation of the Eighth Amendment. To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, . . . must be the guide for analyzing a plaintiff's claims." Patel v. Penman, 103 F.3d 868, 874 (9th Cir. 1996) (citations, internal quotations, and brackets omitted) overruled on other grounds by Unitherm Food Systems, Inc. V. Swift –Eckrick, Inc., 546 U.S. 394 (2006); County of Sacramento v. Lewis, 523 U.S. 833, 842 (1998).

Plaintiff contends that Defendants were deliberately indifferent to Plaintiff's constitutional right to basic life necessities, such as personal contact with others, phone calls, education, and rehabilitation program, by his long-term indeterminate placement in non-disciplinary solitary confinement for close to seven years. An indeterminate sentence in segregated housing, without more, does not constitute cruel and unusual punishment in violation of the Eighth Amendment. See Toussaint v. Yockey, 722 F.2d 1490, 1494 n.6 (9th Cir. 1984) (placement and retention of a plaintiff in segregated housing, even for an indeterminate period of time, does not in and of itself implicate the Eighth Amendment.); Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995) (holding that conditions associated with administrative segregation, such as confinement in a single cell for most of the day, did not violate the Eighth Amendment); see also Perkins v. Crum, 476 Fed. Appx. 136, 137 (9th Cir. 2012) (affirming dismissal of Eighth Amendment claim directed to conditions of confinement in security housing unit); Pina v. Scavetta, 467 Fed. Appx. 605, 606 (9th Cir. 2012) (same); Ruiz v. Cate, 436 Fed. Appx. 760, 761 (9th Cir. 2011) (affirming dismissal of prisoner's Eighth Amendment claim that his security housing unit sentence was disproportionate to his conduct). Accordingly, Plaintiff fails to state a cognizable claim for violation of the Eighth Amendment.

**G.      Further Leave to Amend**

In light of the fact that the Court previously notified Plaintiff of the deficiencies and granted leave to amend, further amendment is not warranted. Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000); Noll v. Carlson, 809 F.2d 1446, 1448-1449 (9th Cir. 1987).

## IV.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      Plaintiff's due process and cruel and unusual punishment claims be DISMISSED, with prejudice, for failure to state a cognizable claim for relief; and

2.      This action shall proceed on Plaintiff's RLUIPA, First Amendment and Equal Protection claims against the above mentioned defendants.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **May 7, 2015**

UNITED STATES MAGISTRATE JUDGE